ST. LOUIS UNION TRUST COMPANY a Corporation, As Executor of the Last Will and Testament of Oreon E. Scott, Deceased; As trustee of a certain Insurance Trust; and As Co-Trustee of a certain Irrevocable Indenture of Trust and Wm. H. Armstrong, as Co-Trustee of said Irrevocable Indenture of Trust, Plaintiffs-Respondents,

v.

Margaret L. BLUE et al., Defendants-Respondents,

Henry G. Harmon et al., Trustees of the Oreon E. Scott Foundation, Defendants-Appellants.

No. 48790.

Supreme Court of Missouri,

Division No. 1.

Jan. 8, 1962.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 12, 1962.

Chas. Claflin Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for appellants.

Christian B. Peper, Grand, Peper & Martin, Frank E. Morris, Jacob M. Lashly and Elihu M. Hyndman, Lashly, Lashly & Miller, St. Louis, Herbert B. Lowe, Denz, Lowe & Limerick, Decatur, Ill., Jesse E. Martin, for respondents.

HOUSER, Commissioner.

This is an action brought by St. Louis Union Trust Company as Executor of the Last Will and Testament of Oreon E. Scott, Deceased, as Trustee of an Insurance Trust created by Oreon E. Scott on September 19, 1932, and as Co-Trustee of an Irrevocable Indenture of Trust created by Oreon E. Scott on May 31, 1950 (hereinafter "the family trust"), and by William H. Armstrong as Co-Trustee of the last-named trust, under the Declaratory Judgments Act, section 527.010 et seq., RSMo 1949, V.A. M.S., and particularly sections 527.020 and 527.040 thereof, to construe Scott's will and trusts, declare the rights, status and legal relations of the parties, and for instructions as to certain of the duties of St. Louis Union Trust Company as executor. Defendants are the legatees named in Scott's will and the several beneficiaries named in his trust, including all surviving members of his family and their descendants, the trustees of the Oreon E. Scott Foundation and of Drake University, certain churches, and numerous other persons. The petition was in two counts. We consider Count I only, since no issues relating to Count II are involved on this appeal. The Circuit Court of the City of St. Louis construed the will and trusts and determined the issues favorably to Scott's family and descendants, in accordance with the contentions of the executor-trustee and co-trustee. The trustees of the Oreon E. Scott Foundation (hereinafter "the Foundation") have appealed.

The petition alleged that Scott created a revocable insurance trust in 1932, a family trust in 1950, and executed a will in 1954; that Scott's will provided for the transfer of assets to the family trust out of his residuary estate sufficient in amount to bring the value of the family trust estate up to $800,000; that the trustee is now holding the sum of $222,000 which it collected on the policies held in the insurance trust on the life of Scott; that on November 12, 1954 Scott amended the insurance trust by making provision for the payment of the proceeds of the insurance to the trustees of the family trust but that this amendment did not provide one way or the other whether the proceeds of the life insurance should become a part of the family trust estate; that at Scott's death there was on hand in the family trust $262,500 of assets, not counting the proceeds of the life insurance policies; that plaintiffs were in doubt whether the proceeds of the life insurance policies should become part of the original family trust and be included in determining how much to pay into the family trust to raise it to $800,000, or whether the insurance proceeds should be held and administered as a separate trust and not be counted toward the

$800,000. The trustees of the Foundation answered, claiming that the amendment to the insurance trust, and the terms of Scott's will, make the proceeds of the life insurance policies a part of the original family trust and that the insurance proceeds should be counted in determining what amount should be taken from the residuary estate to bring up the value of the family trust to $800,000; and alleged that after making the amendment Scott did not change his will; that it was Scott's intent that the execution of the amendment not change the provisions of the will for the distribution of the residue. Two churches and the trustees of Drake University took the same position. Scott's family answered, alleging that the insurance proceeds should be kept as a separate trust and not counted towards the $800,000; that under his will Scott did not intend to count these insurance proceeds even though they went into the original family trust.

## THE INSURANCE TRUST

On September 19, 1932 Scott created an insurance trust imposing upon St. Louis Union Trust Company, as trustee, the duty of collecting the proceeds of Scott's life insurance policies upon his death, dividing the proceeds into three equal shares, one for each of Scott's three daughters who were thereupon to become co-trustees, and paying the net income of each share to the three daughters for their lives, giving the daughters powers of testamentary appointment and providing for the payment of the income to the descendants of the daughters on failure to exercise the powers of appointment; giving the trustee power to encroach upon the principal; reserving to Scott all dividends, surrender values and benefits during his life; the right to sell, assign or pledge the policies, and the power to amend or revoke the insurance trust. When created the trust consisted of insurance policies with $158,000 in death benefits. Additions were later made to the extent of another $60,000. The actual amount of insurance collected at the death of Scott,

plus interest on delayed payments, amounted to approximately $222,000. Between 1932 and 1950 Scott amended the insurance trust four times, changing the manner of distribution of the proceeds of certain insurance policies in the trust in favor of certain members of his family on account of cash loans made by them to Scott in the course of his business operations.

## THE ORIGINAL FAMILY TRUST

On May 31, 1950 Scott executed an irrevocable trust for his family, naming St. Louis Union Trust Company and William H. Armstrong as trustees, reciting that he desired to create an irrevocable trust for the benefit of certain relatives named in the indenture, and that he had transferred and set over to the trustees a certain note and mortgage; that "said note and mortgage, and the securities and property into which the same may hereafter be converted together with any other securities or other property which may hereafter be transferred or conveyed to or deposited with the said Trustees by the Grantor, shall constitute the Trust Estate herein referred to." The trustees were to hold the property in trust for the benefit of Scott's two surviving daughters (the third daughter having died in 1946, leaving one son), his four sisters, his grandson by his deceased daughter, and a niece and a nephew, the son and daughter of his deceased brother Raymond. Provision was made for the pro rata payment of the income from this trust to the beneficiaries in certain specified proportions. Should any beneficiary die leaving children the share of income to which the deceased would have been entitled was to be paid to his children for life. Upon the death of a named beneficiary leaving no children or in the event of the death of the last survivor of a named beneficiary who died leaving children, his or her share of income was to be paid to the Foundation if in existence, otherwise in equal shares to certain favored charities of Scott's (Union Avenue Christian Church of St. Louis, Missouri; the trustees of

Drake University; a church pension fund; a board of church extension). Upon the death of the last survivor the trust was to terminate and the entire balance be distributed free from trust to the Foundation, but if the Foundation should not then be in existence the entire balance should be continued to be held in trust by the same trustees with the same powers and duties for the benefit of the above-named charities. Upon the creation of the family trust Scott transferred $152,000 in assets to the trustees.

## THE FOUNDATION

On December 21, 1950 Scott created the Oreon E. Scott Foundation, a religious, charitable, scientific, benevolent, literary and educational trust. The trust indenture named as trustees the president of Drake University, the president of the Pension Fund of the Disciples of Christ, the treasurer of The National Benevolent Association of the Christian Church and The Boatmen's National Bank of St. Louis. Reciting that he had a high regard for the functions performed in society by foundations created for the above purposes and by means of the trust desired in his name to contribute to and encourage these purposes, he transferred and set over to the trustees certain property, and recited that the property into which it might thereafter he converted, "together with any other stocks, bonds, securities, cash, or other property, real or personal, which may be transferred or conveyed to or deposited with the Trustees by Grantor, or by any other person, firm, corporation or partnership under the terms hereof, shall constitute the Trust herein referred to." The trustees were authorized in their discretion to make gifts of the income to organizations created for religious, charitable, benevolent, scientific, literary, or educational purposes, under the expressed wish of the grantor that the trustees give preference to certain named universities and colleges, churches, pension funds, etc., stressing the establishing and maintenance in these institutions of Oreon E. Scott

awards, loan funds, prizes and scholarships. Scott originally put securities worth $250,000 into this trust. Later he increased its assets to $300,000.

On October 29, 1951 Scott put an additional $50,000 in securities into the original family trust and on March 25, 1953 added $60,000 worth of assets thereto.

## SCOTT'S WILL

On March 11, 1954 Scott made his will. After providing for the payment of his debts and taxes, and bequeathing his household furnishings and other articles of personal property to certain named individuals, he made five $10,000, three $2,500, and one $500 specific bequests to relatives, and then gave, devised and bequeathed the residue and remainder of his estate in two parts. The "First" part placed $100,000 in trust for his nephew, grandson and grandniece. Then this follows:

### "SECOND

"After providing out of my residuary estate for the Trust set forth under 'First,' I give, devise and bequeath to the Trustees of a certain IRREVOCABLE INDENTURE OF TRUST made by me as Grantor on the 31st day of May, 1950 (the family trust), such properties out of my residuary estate as may be necessary to bring the fair market value of that Trust Estate up to the sum of Eight Hundred Thousand Dollars ($800,000.00). In determining the properties necessary for this purpose, I direct that the properties held under the IRREVOCABLE INDENTURE OF TRUST be appraised at their then fair value and the properties hereby devised and bequeathed to said IRREVOCABLE TRUST to attain a value of Eight Hundred Thousand Dollars ($800,000.00) be determined by the values assigned to such properties for Federal Estate Tax purposes.

"The property so devised and bequeathed to the Trustees of said IRREVOCABLE INDENTURE OF TRUST made as of the 31st day of May, 1950, shall be held by

them in Trust under the terms and conditions and for the uses and purposes and with the powers and duties therein set forth."

The third provision of the residuary article bequeathed the rest and remainder of the residue to the Foundation. St. Louis Union Trust Company was named executor of the will.

On October 6, 1954 Scott made a fifth amendment to the insurance trust.

## THE SIXTH AMENDMENT

On November 12, 1954 Scott made a sixth amendment to the insurance trust. The sixth amendment was the same as the fifth amendment except that the sixth omitted the provision in the fifth that the payment of the insurance to the trustees under the family trust be reduced by the estate and inheritance taxes. Specifically, the sixth amendment struck out the first paragraph of the original trust indenture (which had provided for the collection of the proceeds of the policies, division into three equal shares, etc.) and substituted in lieu thereof a new paragraph "FIRST" by which the proceeds of the insurance policies were to be paid "to the St. Louis Union Trust Company, a corporation, of St. Louis, Missouri, and William H. Armstrong of the City of St. Louis, Missouri, as Trustees under the terms of a certain irrevocable trust. This said irrevocable trust herein referred to is the trust entered into upon the 31st day of May, 1950, by and between Oreon E. Scott of the City of St. Louis, State of Missouri, grantor, party of the first part, and the aforesaid St. Louis Union Trust Company, a corporation of St. Louis, Missouri, and William H. Armstrong, as parties of the second part and Trustees." The second change wrought by the sixth amendment was to strike out the second paragraph of the original insurance trust (which had provided for the payment of the net income from the insurance trust to the daughters) and substitute in lieu thereof a new paragraph "SECOND" providing that after paying the proceeds of the insurance to the trustees of the original family trust and obtaining a proper release for such payment, the trustee of the insurance trust "shall be discharged in full of its said duties hereunder and shall be forever released from any obligation herein contained and from any claim or claims against it by any parties whatsoever." The third change was to strike out the third paragraph of the original insurance trust which had provided for encroachment upon the principal of the shares of the daughters if necessary for their support or maintenance or to take care of emergencies, and substitute in lieu thereof a new paragraph "THIRD" providing that the trustee receive no compensation for services rendered in connection with the insurance trust but only reimbursement for the expense of litigation or negotiation attendant upon collecting the proceeds of the insurance policies. Other changes: Paragraph FOURTH, which had provided against anticipation by any beneficiary was stricken out, as was paragraph NINTH, which had provided that in the event any of the daughters should fail to act as co-trustee of her share the other daughters might so act, and paragraph TENTH, which had provided that the trustees should receive for their services 5% of the income and 5% of the principal when distributed free of trust, and that the trust company should receive one half the fee.

## THE EDUCATIONAL AND CHARITABLE TRUST

On November 30, 1955 Scott created the Oreon E. Scott Educational and Charitable Trust, a second religious, charitable, scientific, benevolent, literary and educational trust. The trust indenture named as trustees the same individuals named as trustees of the Foundation, joining with them as corporate trustee St. Louis Union Trust Company. Reciting the same motives and purposes which animated him in the creation of the Foundation, Scott transferred and set over to the trustees assets of the value of $474,500 and gave them power and

made it their duty to accept, receive and hold gifts, legacies, bequests, devises, funds, benefits of trusts and properties of any sort or nature as might come into their hands as trustees. The individual trustees were to make gifts of the income to organizations having the foregoing purposes. The trustees were to give preference to certain named colleges and universities and encourage and aid worthy students and faculty members of schools and colleges of the character described, and encourage and recognize outstanding contributions to health, welfare and advancements in learning, by establishing "Oreon E. Scott Awards or prizes." Scott transmitted certain corporate stock to this trust subject to the condition that there be paid out of income, and principal if necessary, the following charges: $1,125 per month to St. Louis Union Trust Company as co-trustee of a new family trust to be created the next day, to continue for 25 years or until the termination of the new family trust, and two $200 per month charges to named persons, for 20 years or until their death.

## THE SECOND FAMILY TRUST

On December 1, 1955 Scott created a second irrevocable family trust. The trust indenture named St. Louis Union Trust Company and William H. Armstrong as trustees. It was practically identical with the original family trust, including the percentage participation of Scott's various relatives. The only substantial difference was that the children of Scott's sister Ola (who had died in the interim between the two trusts) were named to receive Ola's share of the income, and it was provided that as the named beneficiaries should die the income, and on final termination the capital, should go to the new educational and charitable trust created the day before, instead of going to the Foundation.

Scott died January 9, 1956. At his death the fair market value of the original family trust was approximately $262,500 (not counting the proceeds of the insurance trust). The proceeds of the policies of life insurance, with interest, amounted to approximately $222,000, and it appeared there would be enough funds in the hands of the executor to pay all liabilities of the estate and make any required payments into the family trust. After making these payments, the officers of the corporate executor hoped to be able to pay several hundred thousand dollars to the Foundation, the ultimate residual legatee.

The circuit court made findings of fact, including Finding of Fact No. 12 that it was the intent of Scott to create a separate trust from the proceeds of the insurance policies; decreed that the sixth amendment "does create a separate Trust to be handled and administered by St. Louis Union Trust Company and Wm. H. Armstrong, as Trustees, for the same beneficiaries and with the same powers, duties and under the same terms and conditions as those of the Irrevocable Trust Agreement executed by Oreon E. Scott on May 31, 1950, just as if such powers, duties, terms and conditions had been written into said Sixth Amendment to the Insurance Trust Agreement of September 19, 1932," and ordered the executor of Scott's estate to distribute to the trustees of the original family trust assets necessary to bring up the market value of that trust estate to the sum of $800,000, exclusive of, and without taking into account, any proceeds of the insurance policies.

Appellants, the trustees of the Foundation, contend that the decree is erroneous because contrary to the express provisions of the original family trust that any assets subsequently transferred or conveyed to the trustees shall constitute the trust estate; contrary to the sixth amendment, which terminates the insurance trust, and contrary to the will, which limits to $800,000 the amount up to which the original family trust estate is to be brought. Appellants take the position that Scott did not intend that the amount of $800,000 be increased; that Scott intended that the property in the original family trust and the proceeds of

the insurance policies be treated together as a unit, in a single trust; that the original family trust had independent significance; that the original family trust instrument was not incorporated into the insurance trust by reference; and that a separate trust is to be avoided if it will result in duplication of the gift to the beneficiaries.

Respondents, the relatives of Scott, ask for an affirmance of the decree, urging that Scott's intent to establish a separate trust is established by the sixth amendment, which they say incorporates the terms, conditions and provisions of the original family trust into the insurance trust by reference, thereby creating a new and separate express trust the same as if the indenture of May 31, 1950 had been restated word for word in the sixth amendment; that the decree is not contrary to the will; that an unintended duplication of gifts will not result; that the decree is not contrary to the provisions of the original family trust or of the sixth amendment. Respondents further contend that paragraph 2 of the decree on Count I, which directs the executor to transfer property from the residuary estate to bring up the original family trust to $800,000 without counting the insurance proceeds, should be affirmed because (a) Scott intended that his family benefit from the insurance in addition to the benefits received by them under the will, and (b) the assets of the insurance trust are not to be counted in arriving at the amount of the bequest under section "SECOND", Article Eighth of the will, irrespective of the establishment of a separate trust.

■ In construing the sixth amendment to the insurance trust in the light of Section "SECOND", Article Eighth of the will, and in relation to the granting clause of the original family trust, it is our duty to ascertain and give effect to Scott's intention as far as possible. Scott was a man with a strong sense of family loyalty; a devoted churchman, active in the affairs of the Christian Church and its affiliated institutions, boards and organizations; and an exponent of higher education. In 1932 he had three daughters, three brothers and five sisters. In 1932 he made provision for his three daughters by creating the insurance trust for their benefit. Through the years Scott prospered. He was a widower. One of his daughters died in 1946, and his three brothers died in 1936, 1942 and 1943, respectively. By 1950 Scott was thinking in terms of creating trusts for the benefit of all his blood relatives and the religious and educational institutions and causes in which he was interested. In 1950 Scott created the original family trust, with $152,000 in assets. In the same year he created the Foundation, into which he transferred $250,000 in assets. The beneficiaries of the original family trust were his two living daughters, his four sisters, a grandson, a niece and a nephew. It is significant that Scott reserved the right to make future additions to the assets of both the original family trust and the Foundation. Not only did Scott contemplate additions to these trust estates. He implemented his thoughts with action numerous times. He increased the assets of the Foundation by $50,000. To the original family trust he added $50,000 in 1951 and $60,000 in 1953. In March, 1954 Scott executed his will in which he bequeathed to the trustees of the original family trust such properties out of his residuary estate "as may be necessary to bring the fair market value of that Trust Estate up to the sum of Eight Hundred Thousand Dollars ($800,000.00)." (There is no denial that this was an addition to the original family trust, and no contention that this created a separate testamentary trust.) In October and November, 1954 Scott signed the fifth and sixth amendments to the insurance trust by which he changed the beneficiaries and directed that the insurance proceeds, instead of going into the insurance trust (there to be administered for the benefit of his daughters, the beneficiaries originally named), be paid in their entirety to the trustees "under the terms of" the original family trust. Scott had made provision for the beneficiaries of the insurance trust in the original family trust,

and later made additional provision for them by the creation of additional trusts. On November 30, 1955 Scott created a new charitable trust, The Educational and Charitable Trust, to which he conveyed assets worth approximately $474,500. Scott reserved funds out of that trust for his family by directing certain payments therefrom into the second family trust, (December 1, 1955), which was created for the benefit of the members of his family. In the over-all picture, Scott provided that the members of his family receive a part of the benefit of his estate, the other part to be devoted to his favored religious, charitable and educational institutions. At the death of the last surviving named relative, the favored institutions were to succeed to all of his then remaining estate. He carefully balanced the claims he considered the respective relatives had upon his bounty, discriminately apportioning the percentage distribution to each of them as he deemed appropriate. He knew what he wanted and how to utilize trust and testamentary devices to accomplish his purposes. There is nothing to indicate that on October 7, 1954 when he executed the fifth, or on November 12, 1954 when he executed the sixth amendment to the insurance trust Scott did not know, or that he overlooked, that in his will he had provided that the original family trust be augmented out of his residuary estate a sufficient amount to bring up the value of that trust estate to $800,000. In executing the sixth amendment Scott presumably was fully conscious of the provision of his will that the original family trust have a level of assets of $800,000, and of its effect. Neither his will nor the sixth amendment discloses any intention to set up another and separate trust by which the $222,000 insurance proceeds should be administered independently of the original family trust, and no such intention can be implied, consistent with all of the documents. Scott, a lawyer and a keen businessman, fully aware of the legal effect and implications of his acts, with competent counsel at his disposal, would have written out and specified by express provision any intent and purpose to set up a separate and independent trust, and by codicil to his will would have raised the $800,000 figure to accommodate the sum to be received from the insurance trust, if he had intended the result contended for by the relatives. That he did not do so indicates he did not intend such a consummation. Scott's direction in the sixth amendment that the insurance proceeds be paid St. Louis Union Trust Company and .William H. Armstrong "as trustees under the terms of" the original family trust indicates an intention to the contrary, namely, to administer the funds through an existing, active trust. This language does not incorporate the terms of the original family trust into the insurance trust by reference. In order to incorporate the terms of a trust into another instrument by reference the intention to incorporate must clearly appear, either by direct reference by which the terms and provisions of the one instrument are incorporated, adopted and made a part of the "incorporating" document, or from unequivocal facts and circumstances surrounding the transaction which are indicative of such an intention. 1 Page on Wills, § 263; 94 C.J.S. Wills § 163. An example of clear expression of intention to incorporate is the explicit provision in Bemis v. Fletcher, 251 Mass. 178, 146 N.E. 277, 37 A.L.R. 1471, cited by respondents. Two examples of facts and circumstances pointing unerringly to an intention to incorporate the terms of a trust by reference are to be found in Tootle-Lacy National Bank v. Rollier, 341 Mo. 1029, 111 S.W.2d 12, and Prudential Insurance Co. of America v. Gatewood, Mo. Sup., 317 S.W.2d 382, also cited by respondents. In Rollier the insured designated his wife as the beneficiary in his life insurance policies. She became insane, so as to three policies the insured changed the beneficiary to a bank "as trustee" and in other policies to "the Trustees under the last will and testament" of insured. Thereafter insured made a will leaving $6,000 to his housekeeper as a specific bequest, and bequeath-

ing the residue of his estate in trust for his insane wife, naming the bank as trustee of the testamentary trust and executor of his will. This Court read the provisions of the testamentary trust into the policies and found and declared the existence of an express trust on the basis that Rollier *intended* such a trust to be created, a fact made plain from the immediate and surrounding circumstances. In Gatewood this Court similarly found and declared the existence of a separate trust for the benefit of the insured's children, stressing throughout the opinion the facts and circumstances manifesting an intention on the part of insured "that the bank, *as trustee,* take the proceeds of the policies and hold them in trust for the use and benefit of the children, separate and apart from his estate." 317 S.W.2d, l. c. 387. Without detracting from these decisions and in full concurrence with the principle that an express trust will be found and declared upon proper facts when necessary to effectuate the intention of the party disposing of property and to prevent the *thwarting of his objectives* and purposes, we find the doctrine of incorporation by reference inapplicable. The sixth amendment directs the payment of the proceeds of the insurance trust to St. Louis Union Trust Company and William H. Armstrong "as Trustees under the terms of a certain irrevocable trust" and then describes the trust with more particularity. This descriptive language serves to identify the trust and the trustees to whom the proceeds are ordered paid. It relinquishes and *exports* the proceeds of the insurance policies from the insurance trust to the original family trust. It does not reach out for and *import* the terms, conditions and provisions of the latter trust into the sixth amendment. Nor does this language unite, blend and assimilate the terms of the original family trust in a new, separate and independent trust. There is no direct or indirect reference in the sixth amendment which incorporates, adopts or makes the terms and provisions of the original family trust a part of the sixth amendment. Nor

do the facts and circumstances indicate any intention on the part of Scott to create a trust in the insurance proceeds separate and apart from the original family trust. That Scott did not intend that the insurance proceeds be administered in the insurance trust is further evidenced by new paragraph "SECOND" of the insurance trust, brought into being by the sixth amendment, by which Scott provided that after payment of all proceeds of the insurance trust to the trustees of the original family trust, the trustee under the insurance trust "shall be discharged in full of its said duties hereunder and shall be forever released from any obligation herein contained and from any claim or claims against it by any parties whatsoever," and by new paragraph "THIRD", providing that said trustee under the insurance trust receive no compensation for its services in connection with the insurance trust. This is a clear indication that Scott intended to discharge the trustee and terminate the insurance trust upon the collection of the proceeds of the insurance policies, payment thereof to the trustees and receipt of an acquittance therefor, and intended to eliminate duplication of expenses of administration (trustee's fees, counsel fees, auditors' charges, bookkeeping charges, etc.).

In the related field of wills, where a settlor who has created an inter vivos trust dies and leaves additional property which by his will is to be held upon that trust "it should be treated simply as an inter vivos trust, the property of which has been augmented by the will." Scott on Trusts, Vol. I, § 54.3, p. 383. And see Wells Fargo Bank & Union Trust Co. v. Superior Court, 32 Cal.2d 1, 193 P.2d 721, 724; In re York's Estate, 95 N.H. 435, 65 A.2d 282, 8 A.L.R. 2d 611; State ex rel. Citizens National Bank v. Superior Court, 236 Ind. 135, 138 N.E.2d 900. Paraphrasing In re Rausch's Will, 258 N.Y. 327, 179 N.E. 755, 80 A.L.R. 98, "The direction of the sixth amendment that the insurance proceeds be paid to the trustees, as trustees under the original family trust, was not a declaration of a trust, but the

enlargement of the subject-matter of a trust declared already."

■ We conclude that the true and intended effect of the sixth amendment, the will and the trust indentures, construed together, was to pay over, transfer and pour the insurance proceeds into the original family trust as an addition to that trust estate, the whole thereafter to be administered as a single entity and not as held upon a separate trust; to terminate the insurance trust; to have the insurance proceeds count in determining the amount necessary to be paid out of the residuary estate into the original family trust, and not to increase the level of assets in the original family trust above the $800,000 figure.

■ Respondents say the $222,000 should not be counted as a part of the $800,-000 even though the separate trust theory is not sustained; that Scott intended his family to benefit from his insurance, and never thought of the insurance proceeds as property to be held by his residuary estate but as proceeds to be held by the insurance trust at his death; that Scott could amend or revoke the insurance trust, or sell, assign or hypothecate the policies without the trustee's consent; that time and effort would have to be expended after his death before the insurance proceeds would be collected; that Scott actually had pledged some of the policies, and that it took time for his executor to redeem them; that there was no vesting of any interest in the insurance proceeds "at" Scott's death and no such vesting until "after" his death; that a will speaks as of the death of testator, and Scott's will did not operate upon or affect the $222,000 because this money was not in Scott's estate at the moment of his death. This contention must be disallowed. The fact that time must elapse between the occurrence of death and the payment of insurance proceeds does not postpone the vesting of the rights of the beneficiary. The *rights* of the beneficiary to the proceeds of a life insurance policy become "fixed and vested at the very moment [of death]." John Hancock Mutual Life Insurance Co. v. Dawson, Mo.App., 278 S.W. 2d 57, 61; Smith v. Smith, Mo.App., 313 S.W.2d 753, 756. There was no hiatus between the time the will spoke and the time of the vesting of the legal right of the beneficiary-trustee (and the beneficial right of the trustees of the original family trust) to the proceeds of the life insurance policies. In legal contemplation the insurance proceeds were properties in Scott's residuary estate at the time of his death.

Accordingly, the judgment is reversed and the cause is remanded to the circuit court with directions to set aside its decree on Count I, and enter a new decree, as of January 13, 1959, consistent with this opinion.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.